# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON


TERESA L. MULLINS,                          :

                  Plaintiff,

     -vs-

MICHAEL J. ASTRUE
COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.            :

Case No. 3:11-cv-407

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

2

To qualify for supplemental security benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

Plaintiff filed applications for SSD and SSI on August 6, 2008, alleging disability from May 20, 2008, due to manic depression and anxiety disorder. PageID 165-73, 192. The Commissioner denied Plaintiff's applications initially and on reconsideration. PageID 110-12, 115-27. Administrative Law Judge Amelia Lombardo held a hearing, PageID 59-82, and subsequently determined that Plaintiff was disabled from June 20, 2008, through October 23, 2009, but not thereafter. PageID 38-54. The Appeals Council denied Plaintiff's request for review, PageID 32-25, and Judge Lombardo's decision became the Commissioner's final decision. See *Kyle v. Commissioner of Social Security,* 609 F.3d 847, 854 (6th Cir. 2010).

In determining that Plaintiff was disabled from June 20, 2008, through October 23, 2009, ("the closed period") but not thereafter, Judge Lombardo found that she has had severe bipolar disorder. PageID 46, ¶ 3. Judge Lombardo also found that during the closed period, Plaintiff's

3

bipolar disorder met the criteria of Listings 12.04 and 12.06. PageID 47, ¶ 4. The Judge then found that Plaintiff was disabled during the closed period. PageID 49, ¶ 5. However, Judge Lombardo went on to find that medical improvement occurred as of October 23, 2009, the date Plaintiff's disability ended. *Id.*, ¶ 6. Judge Lombardo found further that beginning on October 23, 2009, Plaintiff has not had an impairment or combination of impairments that meets or equals the Listings and that the medical improvement that has occurred is related to the ability to work because Plaintiff no longer has an impairment or combination of impairments that meets or equals the Listings. *Id.,* ¶ 7; PageID 50, ¶ 8. Judge Lombardo then found that beginning October 23, 2009, Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but that she was limited to simple, repetitive tasks that are low-stress in nature and involve no contact with the general public and only minimal contact with coworkers and supervisors. *Id.*, ¶ 9. Judge Lombardo found further that beginning on October 23, 2009, Plaintiff has been able to perform her past relevant work as a motel cleaner. PageID 53, ¶ 10. Judge Lombardo concluded that Plaintiff was disabled during the closed period and entitled to benefits during that period, but that her disability ended on October 23, 2009. PageID 54.

In August, 2006, Plaintiff sustained a work-related injury to her right index finger. See PageID 304-05. Subsequently, Plaintiff underwent partial fingertip amputation revision which Dr. Miller performed. *Id.* Following surgery, Plaintiff participated in a regimen of physical therapy and on September 14, 2006, the therapist noted that Plaintiff was very emotional and the therapist recommended that Plaintiff seek psychological counseling. See PageID 306-20. Plaintiff's health care providers released her to return to full-duty work on October 17, 2006. PageID 290.

Examining psychologist Dr. Flexman reported on September 26, 2006, that Plaintiff had amputated the end of her finger while operating a punch-press machine at work, she had been experiencing an increase in psychological and emotional difficulties, was getting quite panicky and anxious, and that she got markedly anxious and fearful at the thoughts of going back to work and working around machinery. PageID 262-66. Dr. Flexman also reported that Plaintiff had a long history of psychological and emotional difficulties, has had problems with anxiety and depression most of her life, experienced bad dreams about the work accident, and that she tried to go back to work, but when she was told that she would have to eventually go back to working on the punch press, she had a panic attack, left the job, and did not go back. *Id.* Dr. Flexman noted that Plaintiff has an eleventh grade education, went back and completed her high school education, was abused by her father, had a psychiatric hospitalization in 2000 for depression, had been seeing a psychiatrist once a month for the past three years, was not taking medication, and that she admitted to problems with alcohol but stopped consuming alcohol about five months before the current evaluation. *Id.* Dr. Flexman noted further that Plaintiff's posture was tense, her facial expressions varied between apprehension, anxious, sadness, and anger, her body movements were restless and fidgety, her speech was loud with some press and mildly retarded, the doctor/patient relationship was irritable and angry, her affect was intense, dramatic, overly sensitive, and negative, that lability was present, and that her attitude was angry, anxious, depressed, and that she cried during the examination. *Id.* Dr. Flexman also noted that testing revealed that Plaintiff was performing at the borderline level of functioning, that she had significant impulsiveness and some tendencies to overreact, and that her MMPI results were questionably valid because of her response pattern. *Id.* Dr. Flexman identified Plaintiff's diagnoses as posttraumatic stress disorder, acute, cannabis

5

abuse, continuous, alcohol abuse, current remission, major depression, recurrent, borderline intellectual functioning, and schizoid personality traits, and he assigned her a GAF of 60 for the past year and a current GAF of 45. *Id.*

Examining psychologist Dr. Harris reported on December 19, 2006, that Plaintiff had sustained a work-related injury on August 7, 2006, that she subsequently returned to work but then quit after a co-worker told her they were going to make it hard for her. PageID 266-71. Dr. Harris also reported that due to Plaintiff's verbosity and emotionality, it was necessary to complete her interview on two occasions, that she was extremely labile emotionally ranging from tearful to angry, her verbalizations were long-winded and unfocused, at times her voice was loud, she tended to ramble and be tangential, and that she appeared oriented. *Id.* Dr. Harris reported further that Plaintiff stated she had suicidal ideations every day, she had made one attempt at age fourteen, she denied hallucinations but acknowledged multiple post traumatic stress symptoms, she had seen Dr. Flexman three times since September and reported, "I haven't gotten to the counseling part yet", she was not taking any psychotropic medications, and that she was hospitalized for psychiatric treatment at age fourteen and again in 1999. *Id.* Dr. Harris noted that Plaintiff had not seen her psychiatrist for three years after working with him from 1998 to 2000, she graduated from high school, and that testing revealed that her MMPI results may not be valid. *Id.* Dr. Harris opined that prior to the industrial injury, Plaintiff suffered from post-traumatic stress disorder, major depression, recurrent, and schizoid personality disorder and that the industrial injury aggravated these conditions. *Id.*

The record contains Plaintiff's treatment notes from Darke County Mental Health dated November 11, 2006, through August 19, 2008. PageID 345-80. Those notes reveal that when

6

Plaintiff first contacted that facility, she was seeking anger management counseling. *Id.* Those notes also reveal that when Plaintiff was first evaluated, she was hostile, had normal thought content and processes, was depressed, had a full affect, was aggressive and cooperative, and that her diagnosis was identified as mood disorder NOS and she was assigned a GAF of 55. *Id.* Plaintiff underwent outpatient counseling including anger management with a social worker. *Id.* On February 22, 2007, psychiatrist Dr. Woodrow evaluated Plaintiff and reported that she had previously received psychiatric care, her son had gone to prison a year ago which triggered the current bout of depression which got worse following a work-related injury, and that she was withdrawn, exhibited circumstantial, tangential, racing, incoherent thoughts, and flight of ideas. *Id.* Dr. Woodrow prescribed medication, but Plaintiff did not return for further treatment and was discharged from the program on June 26, 2007. *Id.*

Dr. Flexman examined Plaintiff again on September 30, 2008, at which time he reported that Plaintiff had been in and out of psychiatric treatment over the years, was last in treatment in 2006, was hospitalized for mental health treatment in 2000, and that she had a high school education as well as STNA training. PageID 383-87. Dr. Flexman also reported that Plaintiff stopped using marijuana, cocaine, uppers, downers, and hallucinogens in 2007, her posture was tense, her facial expressions were anxious and angry, her general body movements were fidgety, doctor/patient relationship was angry, her speech was loud and revealed a mild press but was logical and coherent, her affect was intense and lability was present, her attitude was anxious, and that her emotional state was low. *Id.* Dr. Flexman noted that Plaintiff displayed signs of anxiety, she was restless, her thought processes were within normal limits, she had excessive worry about her financial and situational problems, she was oriented, her attention span was fair as was her

effort, her concentration was good, and that her intellectual functioning was below average. *Id.* Dr. Flexman also noted that Plaintiff's memory was fair, her judgment was fair, and that her diagnoses were posttraumatic stress disorder, poly substance abuse in remission, major depression, recurrent, and borderline personality disorder. *Id.* Dr. Flexman assigned Plaintiff a GAF of 45 and he opined that Plaintiff's abilities to understand, remember, and carry out short, simple instructions, to make judgments for simple work-related decisions, and to sustain attention were mildly impaired and her abilities to interact with others and to respond appropriately to work pressures in a normal work setting were markedly impaired. *Id.*

The record contains a copy of treating physician Dr. Brown's office notes dated August 15, 2007, through February 6, 2009. PageID 408-19. Those notes reveal that Dr. Brown treated Plaintiff for various medical conditions including acquired hypothyroidism, atypical skin lesion, and depression. *Id.* On February 9, 2009, Dr. Brown reported that Plaintiff's diagnosis was moderate depression, that she reported hallucinations and paranoid thoughts, and that she was unable to be employed. *Id.*

Plaintiff again sought mental health treatment at Darke County Mental Health Mental Health during the period June, 2009, through March, 2010. PageID 420-598. Those records reveal that at the time Plaintiff was initially assessed, she reported that she wanted to get her anger under control. *Id.* Those records also reveal that Plaintiff attended individual counseling sessions during which it was noted that she appeared to be overwhelmed with financial concerns and family issues, that she needed social services assistance, and that she appeared anxious. *Id.* Over time, Plaintiff's mental health care providers reported that Plaintiff had paranoid thoughts, tangential and illogical thought processes, poor insight and judgment, she was disheveled,

8

preoccupied, avoidant, agitated, pressured, had flight of ideas, was conflicted, very angry, and had problems communicating. *Id.* On March 24, 2009, Dr. Woodrow reported that Plaintiff was tearful, irritable, sleeping poorly, depressed, overly sedated by her medication, experienced thoughts of harming a welfare employee and then killing herself, and that she refused a voluntary hospital admission. *Id.*

Dr. Woodrow reported on August 4, 2009, that Plaintiff was being treated for a mood disorder and posttraumatic stress disorder, was compliant with treatment, and that Plaintiff was not able to work due to her mental illness. *Id.* Dr. Woodrow also reported that Plaintiff was irritable, anxious, and paranoid, she could not tolerate being around people, had PTSD due to a work-related injury, her concentration was poor, and that she could not remember instructions. *Id.* Dr. Woodrow reported further that Plaintiff's GAF was 35, she was markedly restricted in activities of daily living, had extreme difficulties in maintaining social functioning, had frequent deficiencies in concentration, had repeated/continual episodes of deterioration, was moderately to markedly to extremely limited in her abilities with respect to personal/social, occupational, and performance adjustments, her prognosis was poor, she had a history of noncompliance, and that she was unable to work due to her fear of a repeat accident. *Id.*

Plaintiff continued to receive treatment from her counselor as well as Dr. Woodrow. In December, 2009, Dr. Woodrow noted that Plaintiff had a marked impairment in her ability to function outside of her home, relate to others, adjust to routine changes in a work setting, deal with work stress, and demonstrate reliability. *Id.* On March 2, 2010, Dr. Woodrow noted that Plaintiff had reported that she had not bathed or showered for over a year because water hurt her, she appeared anxious, had impaired judgment, and was isolating herself. *Id.*

On June 10, 2010, Plaintiff's mental health care providers noted that Plaintiff had partially met her treatment goals, she had made progress in treatment, her overall functioning had improved, she still needed to improve her socialization skills, and that she continued to need assistance in accessing social services. *Id.* Plaintiff was transferred to the community psychiatric support program because she was in need of continued support. *Id.* Over time, Plaintiff reported experiencing increased anxiety over leaving her home, it was noted that she had low self-esteem and needed to continue to work on improving her coping skills and address her anger and anxiety. *Id.*

The record contains additional medical treatment notes from Darke County Mental Health dated March 24, 2009, to May 18, 2009, June 8, 2009, to March 30, 2010, and April 6, 2010, to June 7, 2011, and a May 26, 2011, report from Dr. Woodrow.  PageID 604-855. However, since the Appeals Council denied Plaintiff's request for review, that evidence is not a part of the record for purposes of substantial evidence review of Judge Lombardo's decision. *See Bass v. McMahon,* 499 F.3d 506, 512-13 (6th Cir. 2007), *citing, Cline v. Commissioner of Social Security,* 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).

In her Statement of Errors, Plaintiff argues that the Commissioner erred by finding that she had medically improved as of October 23, 2009, to the point that she could perform work activity when the substantial evidence shows that she continued to be disabled.   (Doc. 8).

As noted, this case involves a closed period of disability. "In order to find a closed period of disability, the [Commissioner] must find that at some point in the past, the claimant was disabled and that, at some later point in the past, he improved to the point of no longer being disabled." *Long v. Secretary of Health and Human Services,* No. 93-2321, 1994 WL 718540 at *2

(6th Cir. Dec. 27, 2994)(45 F.3d 430(table)). A determination of medical improvement must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with the individual's impairment. See 20 C.F.R. § 404.1594(b)(1).

In determining that as of October 23, 2009, Plaintiff had medically improved and that the improvement was related to her ability to work, Judge Lombardo determined that Plaintiff had experienced a series of stressors in 2008, was not receiving any treatment at that time and seemed to decompensate, and that once she began treatment and was complaint with medications, her condition rapidly improved. PageID 49. In support of her conclusion, Judge Lombardo relied primarily on Plaintiff's treatment notes from Darke. County Mental Health. PageID 51-52.

As Judge Lombardo noted, on October 15, 2009, Dr. Woodrow reported that Plaintiff's mood was "pretty good", that her sleep was good, that she was making quilts, and that she had not reported any side effects from her medications. PageID 483-84. On October 22, 2009, Plaintiff reported that she had been "depressed for no reason the other day" but that she denied being depressed currently and that she felt "torn between two people who want her for themselves". PageID 522-23. Plaintiff reported on November 18, 2009, that her anger level had decreased since beginning treatment and the clinical notes from that date do not reflect any mental health abnormalities. PageID 512-13. Indeed, on December 10, 2009, Dr. Woodrow reported that Plaintiff was "doing well overall", her mood had been stable, she had been sewing for Christmas, her landlord liked her, and that her thought processes, thought content, perception, mood/affect, cognition, and insight/judgment were all within normal limits. PageID 506. In addition, on March 30, 2010, Dr. Woodrow reported that Plaintiff "felt better in the spring", she was not able to sell the blankets she was making so she was making them for the Red Cross, her mood/affect were

11

cheerful and optimistic, and that she was coping well with stressors, PageID 489-90, on April 20, 2010, Plaintiff reported her mood had improved, PageID 593, and on May 19, 2010, Plaintiff reported that "things were going well for her". PageID 588.

While it is true that on June 4, 2010, a mental health care provider reported that Plaintiff was "in need of continued support", he also noted that Plaintiff was appropriate in speech, mood, and affect, PageID 583. Further, on June 22, 2010, it was noted that Plaintiff was going out socially on the weekends, and that her appearance/demeanor/activity/speech, thought process, perception, and cognition were within normal limits, her mood was euthymic most days, her behavior was productive, and her insight/judgment were good. PageID 570. Plaintiff's clinical notes from Dark County Mental Health from July, 2010, through November, 2010, continue to reflect that Plaintiff had normal mood, affect, speech, sleep, appetite, and, generally, normal mental status examinations. PageID 563; 570; 546; 551; 555; 557; 563; 532.

As Judge Lombardo determined, Plaintiff's activities belie her claim of continued disability. For example, as noted above, Plaintiff sewed "for Christmas", made blankets for the Red Cross, went out socially on the weekends, was torn between two people who want her for themselves, and that her landlord liked her. In addition, Plaintiff went camping on the weekends with her sister, planned to get a computer and go back to school, painted her apartment, took a trip out of state with friends and "had a great time", babysat, had a boyfriend, and exercised. PageID 499; 518; 541; 551; 563; 569; 585.

This Court concludes that the Commissioner's decision that Plaintiff had improved, that her improvement was related to her ability to perform work, and that she was no longer disabled after October 23, 2009, is supported by substantial evidence.

12

Plaintiff argues that the Commissioner erred by rejecting treating psychiatrist Dr. Woodrow's and treating psychologist Dr. Flexman's opinions that she is disabled. For purposes of this discussion only, the Court will assume *arguendo* that Dr. Flexman is a treating source.

A physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *See, Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* The weight accorded to a physician's opinion is dependent on whether it is well supported by medically acceptable clinical and laboratory techniques and whether it is inconsistent with the other substantial evidence in the record. *Cf., Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994). Stated differently, the Commissioner may properly reject a physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). However, the ALJ must provide "good reasons" for discounting treating physicians' opinions, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007)(citation omitted).

For the same reasons that this Court has determined that Judge Lombardo properly determined that Plaintiff's disability had ceased in October, 2009, the Court finds that the Commissioner had an adequate basis for rejecting any opinions offered by Dr. Woodrow and/or Dr. Flexman that Plaintiff continued to be disabled after October 23, 2009. Specifically, any such

opinions are entirely inconsistent with Plaintiff's clinical notes from her mental health care providers, including Dr. Woodrow, as well as with her self-reported activities.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

August 20, 2012.

s/ *Michael R. Merz*
United States Magistrate Judge

J:\\social_security//Mullins_SSD&DDI

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service

listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).